Harold E. ANDERSON,
Plaintiff-Respondent,

v.

BURLINGTON NORTHERN RAILROAD
COMPANY, a corporation,
Defendant-Appellant.

No. 44977.

Missouri Court of Appeals,
Eastern District,
Division One.

April 19, 1983.

Edward W. Mullen, Derek E. Wood, Deacy & Deacy, Kansas City, for defendant-appellant.

C. Marshall Friedman, Newton G. McCoy, Friedman, Weitzman & Friedman, P.C., St. Louis, for plaintiff-respondent.

GAERTNER, Judge.

Defendant, Burlington Northern Railroad Company, appeals from the judgment entered in favor of plaintiff, Harold E. Anderson, in the sum of $1,067,000.

On May 6, 1977, plaintiff was an employee of defendant. His duties required him to ream bolt holes in the metal flooring of hopper cars. He used an air-powered reamer, the exhaust from which caused the metal shavings to be blown into his face at times. He was wearing safety glasses or spectacles but they did not prevent particles of metal from being blown into his eyes. There was conflicting evidence regarding the availability to plaintiff and the use by other employees of various types of safety goggles. While reaming a hole with the exhaust blowing into his face, plaintiff felt a pain in his left eye. After finishing the last hole, he went to his foreman, obtained eye wash, and washed his eye. His eye continued to hurt over the weekend. Although his eye continued to hurt, he worked on Monday. On Tuesday he returned to work and was sent to a doctor who removed a piece of metal from his eye and who attempted to clean the eye by means of drilling into it. He continued to work and to visit the doctor because of pain. On May 22 plaintiff was admitted to the hospital. Surgical efforts to save the eye were unsuccessful and it was eventually enucleated.

Defendant's first point on appeal is that it is entitled to a new trial because of misconduct of the jury foreman. During the voir dire examination of prospective jurors, plaintiff's attorney inquired whether "any of you or your immediate family had been a party to a lawsuit, . . . ." Three veniremen responded and were questioned briefly concerning their experiences. Subsequently, defendant's counsel asked "is there any member of this panel or member of your family who now has or has ever had a lawsuit against anybody for money damages; whether it's because of a bodily injury, or maybe it was a libel case, the St. Louis Post Dispatch said something you didn't like, or whatever it might have been? Any of you folks or members of your family who have ever sued anybody for money damages whether or not any lawsuit was filed? I think we've already heard about Mrs. Moretto, briefly. Whether or not a lawsuit was filed, is there anybody else on the panel who has ever made a claim against anybody for money damages or member of your family has made such a claim because of a bodily injury?" Two veniremen responded concerning claims made by reason of bodily injury sustained by their brothers in automobile accidents. Three others told of injuries which they personally had sustained and for which they had been compensated. One mentioned a personal injury claim made against his parents. At the conclusion of his discourse with these six members of the panel, defendant's attorney asked, "is there anyone else who has had a similar experience where you or some member of your family has had a claim for some kind of bodily injury?"

Eugene A. Krus, Jr. became the foreman of the jury. During all of the dialogue concerning lawsuits and claims for bodily injuries sustained by veniremen or members of their families, he remained mute. He was called as a witness on defendant's motion for a new trial. Krus then admitted that his brother had sustained facial injuries in an automobile accident. He recalled that some five years before the present trial, his brother and his parents had spent three days attending the trial of the lawsuit

resulting from this injury and that the jury in that trial returned verdicts in favor of his brother and his parents which totalled in excess of $20,000. At the time of the accident and of that trial he was unmarried and resided with his parents and brother. Krus further testified at the post-trial hearing that he remembered the questions regarding injuries and lawsuits by veniremen or members of their families. He volunteered, "you brought it to our attention maybe three or four times." As an explanation for his failure to answer the question, he testified "mostly the reason why I didn't say anything about my brother—in fact, it did cross my mind about my brother, but I recently did get married a year ago, and as far as I'm concerned, my family is my wife and myself . . . ." However, he testified that prior to his marriage he lived with "[m]y father and my mother and my family, my brothers and sisters." When asked if he had heard two others on the jury panel respond to the questions by advising of injuries sustained by their brothers, Krus answered that he would have disclosed the facts concerning his brother "if I wasn't married and I was living in my mother and father's house . . . ." He further stated that when the question was asked "I distinctly remember thinking of my brother, because that's the only lawsuit I remember in our family." Krus also admitted that after learning that the railroad attorney wanted to question him on this matter, he telephoned plaintiff's trial counsel, gave a signed statement to one of his associates and refused to talk to the railroad attorneys.

The principles guiding our review of this issue are well stated in *Marshall v. Brown,* 608 S.W.2d 105, 109 (Mo.App.1980),

"Intentional concealment of information on voir dire may be grounds for the granting of a new trial, since bias and prejudice of the veniremen may be inferred from such concealment. *Beggs v. Universal C.I.T. Credit Corp.,* 387 S.W.2d 499, 503 (Mo. banc 1965); *Triplett v. St. Louis Public Service Co.,* 343 S.W.2d 670, 672 (Mo.App.1961). Unintentional failure to disclose information does not necessarily give rise to such an inference. *Triplett,* supra, 673. Determination of whether concealment was intentional or not is left to the discretion of the trial court, its ruling to be reversed only upon a clear showing of abuse of that discretion."

We have analyzed the many decisions regarding the failure of a prospective juror to respond to questions on voir dire regarding his or her family experiences with claims and litigation. This analysis reveals that the courts have almost universally ordered a new trial where the failure to disclose was made with the juror's understanding of the question and his then present awareness of the prior experience. Where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable, failure to disclose is held to be intentional. Intentional nondisclosure as determined by these factors, has become tantamount to a per se rule mandating a new trial regardless of the action taken by the trial judge in ruling upon the motion for a new trial.

In *Marshall v. Brown,* 608 S.W.2d 105 (Mo.App.1980), prospective jurors were asked in voir dire if they ever made a claim for money damages. One prospective juror did disclose her involvement in an accident, her injuries and one call to an insurance adjuster. Her further answers indicated that upon the adjuster's advice that "they didn't pay off for anything like that," she made no claim. However, post trial investigation disclosed she in fact had made a number of calls to the adjuster, estimated at four, and had filled out and signed a written claim form. This court found an abuse of discretion on the part of the trial court in accepting the explanation that "claim" was not understood to encompass a request for compensation for injuries which was refused.

"We find the trial court's ruling that the concealment was unintentional in this

case to be unsupported by the record of the voir dire proceedings and the juror's testimony at the hearing on defendant's motion for new trial."

*Marshall v. Brown,* 608 S.W.2d at 110. This court reversed the judgment and remanded the cause for a new trial.

*Triplett v. St. Louis Public Service Co.,* 343 S.W.2d 670, 672 (Mo.App.1961), is somewhat analogous to the instant case. In *Triplett,* a prospective juror was asked whether "you or any member of your family or someone living in your household ever had a claim or lawsuit against any person or company," to which he responded "no, sir." The prospective juror claimed misunderstanding in that he believed the question concerned lawsuits by members of his family rather than by himself. Noting the repetition of the identical question and the responses by six other prospective jurors, the court reversed the trial court's acceptance of this excuse. The explanation "unduly taxes our credulity." *Triplett v. St. Louis Public Service Co.,* 343 S.W.2d at 675. The cause was remanded for a new trial.

In *Brady v. Black & White Cab Company,* 357 S.W.2d 720 (Mo.App.1962) the court held it discretionary for the trial court to determine if the concealment or non-disclosure was intentional or merely based upon forgetfulness. However, where the juror testified that he remembered his wife's claim but did not recall enough details to enable him to answer questions about it, the trial judge abused his discretion by accepting such an excuse. The case was remanded for a new trial.

Similar action was taken by the supreme court in *Beggs v. Universal C.I.T. Credit Corporation,* 387 S.W.2d 499, 503–504 (Mo. banc 1965). The Court stated:

"'In the final analysis, therefore, the question of what result should follow the failure of a juror to correctly answer a question touching his qualifications depends upon whether or not he was guilty of an intentional concealment. Primarily, the determination of that question must be left to the sound discretion of the trial court. *Reich v. Thompson,* 346 Mo.

577, 142 S.W.2d 486, 129 A.L.R. 795. Nevertheless, the exercise of such a discretion is subject to judicial review, and if an appellate court concludes from the record that an abuse of discretion unmistakably appears, it is its duty to reverse the ruling. *Piehler v. Kansas City Public Service Co., supra,* [357 Mo. 866, 211 S.W.2d 459]; *Harrison v. St. Louis Public Service Co.,* Mo.App., 251 S.W.2d 348." *Triplett v. St. Louis Public Service Co.,* Mo.App., 343 S.W.2d 670, 672, 673."

*Dalton v. Kansas City Transit, Inc.,* 392 S.W.2d 225 (Mo.1965), involved the failure to disclose multiple claims, including one on the grounds that the juror did not consider his grand-daughter to be a member of his immediate family. Holding it was not up to the juror to determine whether or not his experiences were important or significant, the supreme court found it to be abuse of discretion for the trial court to accept as an excuse for non-disclosure: "I remember them, yes ... I didn't think anything I had amounted to anything. If I did, I would have spoke up and been out the door like some of the rest of them did, where I would like to have went." Since the juror had "heard and understood" the question and the responses of other jurors, his failure to disclose even a minor claim was intentional, necessitating reversal. Also pertinent here is the fact that the supreme court saw fit to detail the juror's lack of cooperation with the defendant's post-trial investigation and their preparation for a hearing on the motion for new trial.

Examples of decisions reaching opposite conclusions are *Begley v. Adaber Realty and Investment Co.,* 358 S.W.2d 785 (Mo. 1962); *Akers v. St. Louis Public Service Co.,* 370 S.W.2d 347 (Mo.1963); *Davis v. Kansas City Public Service Company,* 361 Mo. 61, 233 S.W.2d 679 (Mo.1950); *O'Brien v. Vandalia Bus Lines,* 351 Mo. 500, 173 S.W.2d 76 (Mo.1943); *Blond v. Overesch,* 527 S.W.2d 663 (Mo.App.1975); and *Harrison v. St. Louis Public Service Co.,* 251 S.W.2d 348 (Mo.App.1952).

In *Begley,* the juror failed to respond to a question about "filing" a claim because he

equated that word with the filing of a lawsuit, not to direct negotiations with an insurance company. The supreme court, citing *Thompson v. Quarles,* Tex.Civ.App. (1957) 297 S.W.2d 321, as authority, held the juror's "highly refined distinction" between the making and the filing of a claim provided the trial court with a basis for the exercise of its discretion in favor of a finding of no intentional concealment. *Begley v. Adaber Realty and Investment Co.,* 358 S.W.2d at 793.

In all of the other cases mentioned above in which the denial of a new trial was affirmed, the reviewing court concluded the trial court was justified in accepting as an excuse that the claim had been forgotten—due to insignificance or remoteness in time. For example, in *Akers,* failure of five jurors to disclose claims was excused. The claims —$25 for bruises and broken glasses, a $50 workers compensation payment, a $75 payment to a juror's wife, a workers compensation payment for one week off work, and medical bills paid by the St. Louis Cardinals when a juror was hit by a home run ball— were of such insignificance as to be of no "more than transitory concern." Further, when reminded of the claims, each of the five jurors "forthrightly and to the best of his or her ability undertook truthfully to answer every question propounded." *Akers v. St. Louis Public Service Co.,* 370 S.W.2d at 355.

*Davis* involved a $10 payment 14 years before which was considered to be a forgettable incident. In *O'Brien,* a lapse of 10 years between settlement of a claim and jury duty was found acceptable as an excuse for non-disclosure. A payment of $50 to a juror's wife one year and seven months before was found to be so "trifling" as to justify the juror's lapse of memory in *Harrison.*

We have not attempted to set forth in this opinion an exhaustive review of the numerous cases in which this recurring and regrettable problem has been considered. Suffice it to say that the cases mentioned herein exemplify a consistent pattern of case-by-case evaluation of the facts and the

mandating of a new trial when such facts indicate intentional concealment. This ultimate fact is always found where the juror admits rememberance of the incident and his contention of misunderstanding is unrealistic or unreasonable. This per se rule is predicated upon the constitutional guarantee of trial by jury.

> "The constitutional right of every citizen to a trial by jury to be meaningful contemplates a fair and impartial jury. The jury should consist of twelve impartial, qualified jurors. Even though three-fourths of them can decide a civil case, parties are entitled to have that decision, whether for them or against them, based on the honest deliberations of twelve qualified jurors. *Lee v. Baltimore Hotel Co.,* 345 Mo. 458, 136 S.W.2d 695, 127 A.L.R. 711. It is the duty of a juror on voir dire examination to fully, fairly and truthfully answer all questions directed to him so his qualifications may be determined and so that challenges may be intelligently exercised. It makes no difference whether the unanswered or untruthfully answered question was one asked to the panel generally or to the particular juror individually. So long as he hears the question and understands that it calls for an answer by him as a member of the panel, even though it may be directed to the panel generally he is not relieved of his duty to answer."

*Beggs v. Universal C.I.T. Credit Corporation,* 387 S.W.2d at 503.

Here, juror Krus admitted that he heard the question and that it brought to his mind his brother's accidental injury and the lawsuit which ensued. His explanation for concealment—that blood relatives were no longer members of his family since his marriage one year before—"unduly taxes our credulity." It is belied by his own testimony that until his marriage he lived with "my father and mother and my family, my brothers and sisters," that the case involving his brother was "the only lawsuit in our family," and that his family dinner last Christmas consisted of his "grandma, grandpa, my uncles, my aunts, my mom and

dad, my brothers and sisters, myself and my wife, their spouses." Moreover, Krus heard two other prospective jurors respond to the question by relating claims made by their brothers. These facts, especially when viewed in the light of Krus' call to plaintiff's attorney and refusal to talk to defendant's attorneys concerning the matter, point unerringly to the conclusion that his non-disclosure constituted intentional concealment, and possibly deliberate deception. "Honest men do not hesitate to divulge information touching their qualifications as jurors." *Bass v. Durand*, 345 Mo. 870, 136 S.W.2d 988, 990 (Mo.1940). Bias and prejudice of a juror is inferred from intentional concealment. *Girratono v. Kansas City Public Service Company*, 272 S.W.2d 278, 281 (Mo.1954). It is irrelevant that no one can tell the extent to which Krus influenced other members of the jury, although his selection as foreman is certainly indicative they looked to him for leadership. Parties in a civil case are always entitled to have a jury decision, whether for them or against them, based on the honest deliberations of twelve qualified jurors. *Beggs v. Universal C.I.T. Credit Corporation*, 387 S.W.2d at 503. "Where there is a dispute as to liability, and an objectionable juror is permitted to try the case, it is difficult to conceive how that would be harmless error, unless waived by the losing party, even though there be a unanimous verdict." *Triplett v. St. Louis Public Service Co.*, 343 S.W.2d at 675, quoting from *Webb v. Missouri-Kansas-Texas Ry. Co.*, 342 Mo. 394, 116 S.W.2d 27, 29. We find the defendant herein was deprived of his constitutionally guaranteed right to a trial by twelve impartial jurors and that it was an abuse of the trial court's discretion to deny defendant's motion for a new trial on this ground when the facts surrounding juror Krus' concealment disclosed it to be intentional.

We agree with the expression contained in many of the cases mentioned above that reversal due to intentional concealment by a juror is ordered with reluctance. In this case, however, other incidents occurred which well may have resulted in the same consequence. We feel constrained to address those which are likely to recur at a second trial.

■ Defendant contends that the trial court erred in admitting speculative testimony concerning the possibility of some future happening to plaintiff's remaining eye and in permitting plaintiff's attorney to argue this possibility to the jury. During the trial, over defendant's objections, plaintiff's attorney in his examination of medical witnesses repeatedly elicited answers as to the effect of future accidents, diseases such as glaucoma or cataracts, or future surgery upon the remaining eye of a person who has suffered the loss of one eye. The medical evidence was undisputed that plaintiff's right eye was normal and in no way affected by the injury sustained in this case. Defendant herein has no responsibility for some future development which might affect plaintiff's right eye. In his brief, plaintiff concedes this testimony was not elicited in an effort to demonstrate plaintiff's present "mental or emotional problems resulting from his fears of blindness and that subject was not the basis of the physician's testimony."

Precautions taken by plaintiff which might affect his present mode of life and existing emotional problems, if any, would legitimately be of probative value for the jury's consideration. Under the ruling in *Hoffman v. St. Louis Public Service Company*, 255 S.W.2d 736, 742–743 (Mo.1953), a plaintiff would not be entitled to compensation for the possible future loss of her second ovary, but she could properly introduce medical testimony of present nervousness caused by such a fear. That such was not plaintiff's purpose here is demonstrated not only by the repetitive questions of plaintiff's attorney regarding future accidents to the other eye and surgical procedures if the other eye became damaged or diseased, but was accentuated when almost at the end of his final argument, he said to the jury "[plaintiff] cannot call this jury back and say to you 'look at me now. Look what's happened to me. Look at my condition at the present time.' " Objections to this argument and to the interrogation of

the medical witnesses were all overruled. The cumulative effect of the repetitive interrogation regarding future possibilities unsupported by any evidence of causal connection to the present injury, and the final argument directing the jurors to speculate about future contingencies, should not have been permitted. In *Zoeller v. Terminal Railroad Ass'n of St. Louis,* 407 S.W.2d 73 (Mo.App.1966), this court ordered a new trial on the issue of damages only because of a combination of 1) improper admission of future consequences of an injury which were not shown by medical testimony to be causally related to the injury in question and 2) a jury argument regarding permanent injury. See also *Phillips v. Hamilton Brown Shoe Company,* 178 Mo.App. 196, 165 S.W. 1183 (Mo.App.1914).

■ Plaintiff's exhibit 45 purported to be a memorandum to a supervisor which was signed by a number of defendant's employees in St. Louis [1] complaining about the inadequacy of the goggles they were furnished by the company. The exhibit, which was never authenticated, identified nor introduced, was used during the cross examination by plaintiff's attorney of an engineer formerly employed by the defendant to test protective equipment including safety goggles. After eliciting from the witness that he had no knowledge whatsoever about employee complaints concerning the adequacy of goggles or eye protection and that the witness never received supervisors' notes or memoranda concerning safety meetings, plaintiff's attorney then asked the witness, "did Mr. Reddick show you a copy of the letter signed by all of the car men working here in St. Louis complaining that the goggles they were issued were totally inadequate and were making people blind and putting things in their eyes?"

In fact, the letter did not state that anyone had been blinded or even that anyone had sustained an injury. It referred to a possibility of future "reportable accidents and even blindness of vision." Since this case must be remanded because of juror misconduct, we need not discuss the prejudicial effect of this misquotation which was never corrected within the hearing of the jury despite the fact plaintiff's attorney continued to question the witness about the document and its contents for four more pages of transcript.[2]

It was apparent from the responses to the first three questions asked of the witness on cross-examination that he had no knowledge or information about the exhibit or its subject matter. Even overlooking the misquotation, it was improper to permit plaintiff's attorney to indulge in further extensive interrogation regarding an unidentified memorandum. The mere fact that it was obtained in response to a broadly worded pretrial motion to produce does not render an unidentified document admissible into evidence—the argument advanced by plaintiff's attorney to the trial judge. Further, there was no evidence tending to show any similarity between the type of work done by the St. Louis employees and that assigned to plaintiff in Springfield. Nor can it be determined that the type of goggles supplied to the St. Louis employees was comparable to the various types available to plaintiff in Springfield. In the absence of proper identification and a showing of relevance, plaintiff's exhibit 45 should not be a part of the second trial.

■ Defendant has also asserted as grounds for reversal what is argued to be an excessive appeal to passion and sympathy of the jurors by reason of the use of certain photographic exhibits and offered demonstrations in the presence of the jury. At issue are six color photographs received in evidence. One is a 16″ × 20″ blowup showing the use of a surgical instrument

---

1. Plaintiff's injury was sustained in the Springfield, Missouri yards of the railroad.

2. Defendant's request for a mistrial was denied. Whether or not the admonition to the jury to disregard the statement of plaintiff's counsel when followed immediately by extensive further questions regarding the unidentified document was sufficient to cure the prejudicial effect thereof, need not be addressed here. The misquotation is not likely to recur at a second trial.

upon someone's eyeball. Another is an 8" × 10" photograph of plaintiff showing his false eye directed toward the camera and his right eye turned to the side. The other four are 8" × 10" pictures of plaintiff's empty socket. The four are all close-ups enlarging the size of the socket, one measuring the empty socket to be 6½" wide. These four are indeed gruesome and likely to arouse feelings of sympathy. That fact, however, does not in and of itself render their admission improper. Rather, it calls for a judicious balancing of the probative value of the photographs and their inflammatory effect. To the extent that each of the four photographs purported to illustrate a different condition, they did have probative value. However, the photographs were introduced in evidence during the testimony of plaintiff and immediately passed to the jury. The medical distinctions between the features of each photograph could not be detected by the average juror without training in ophthalomogy. Only after the photographs were again displayed to the jurors during the testimony of a medical witness did these distinctions have any meaning to the jury. What took place immediately after this latter display compounded the emotional appeal to jurors' sympathy. Plaintiff's attorney called his client from counsel table to a position directly in front of the jury box and the testifying doctor was asked to remove the conformer, or false eye, and display it to the jurors. The jury was spared this repulsive ordeal when the trial court ordered plaintiff and the doctor to step into the hall, remove the prosthesis and then return to display it to the jury.

Acknowledging the probative value of the exhibits, the timing, manner and extent to which they were paraded before the jury create an impression of a blatant appeal to the emotions of the jurors. Such conduct is not to be condoned and should not be allowed. In *Taylor v. Kansas City Southern Railway Company,* 364 Mo. 693, 266 S.W.2d 732, 736 (Mo.1954), it was held to be an abuse of discretion to permit doctors to dramatically describe the step-by-step procedure of a laminectomy. In remanding the case, the supreme court stated, "the maimed, the widow, and the orphan draw strongly enough on the hearts of jurymen without affirmative effort to arouse sympathy." In *Kickham v. Carter,* 314 S.W.2d 902 (Mo.1958), the supreme court held that the trial court's granting of a new trial was justified because of the use by a doctor witness of photographs showing the surgical procedure performed upon the plaintiff. In determining the permissible manner and extent of the use of demonstrative evidence on retrial of this case, counsel and the trial court can be guided by the principles laid down in *Fitzpatrick v. St. Louis-San Francisco Railway Co.,* 327 S.W.2d 801, 807–8 (Mo.1959), which emphasizes that a calculated effort to create sympathy or prejudice mandates a new trial unless it affirmatively appears that no prejudice in fact resulted.

We shall not further prolong this opinion by detailed discussion of other improprieties complained of by defendant as they are not likely to be permitted at retrial.

The judgment is reversed and the case is remanded for a new trial.

SIMON, P.J., and STEPHAN, J., concur.